UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

SUSANA CASTILLO, CLARISSA
VASQUEZ, VERONICA BOTELLO,
DULCE SOSTENES, DORAELIA
NUNEZ, MANUEL NUNEZ
MORALES, JR., TRUE BLUE BERRY
MANAGEMENT, LLC, a Michigan
limited liability company, SMELTZER
ORCHARDS CO., LLC, a Michigan
limited liability company,

      Plaintiffs,

v.

GRETCHEN WHITMER, in her official
capacity as Governor of the State of
Michigan, and ROBERT GORDON, in his
official capacity as the Director of the
Michigan Department of Health and
Human Services, and GARY
MCDOWELL, in his official capacity as
the Director of the Michigan Department
of Agriculture and Rural Development,

      Defendants.

Case No. 1:20-CV-751

Honorable _____

---

## **COMPLAINT**

Plaintiffs, by and through their counsel, Varnum LLP, hereby state as their Complaint against Defendants Gretchen Whitmer, in her official capacity as Governor of the State of Michigan, ("Governor Whitmer"), Robert Gordon, in his official capacity as Director of the Michigan Department of Health and Human Services ("Director Gordon"), Gary McDowell, Director of the Michigan Department of Agriculture and Rural Development ("Director McDowell") as follows:

## **NATURE OF ACTION**

1.     Michigan Department of Health and Human Services Director, Robert Gordon, has singled out the Latino community, and in particular, Latino agricultural workers, for mandatory COVID-19 testing. According to Director Gordon, Latinos disproportionately carry the COVID-19 virus, and consequently pose a disproportionate risk for spreading the disease. On this rationale, Director Gordon issued an emergency order targeting Latinos for mandatory COVID-19 testing; something unheard of during this pandemic. In short, migrant/seasonal workers and workers in the meat, poultry and egg processing industries (who are predominantly Latino) must submit to COVID-19 testing, or lose their jobs and housing.

2.     Pandemic or not, the State cannot subject one racial class of people to a different set of rules than it applies to others. The Equal Protection Clause is at the heart of our Constitution and it remains in force notwithstanding any declared state of emergency. Governor Whitmer and Director Gordon are free to battle COVID-19, but they must do so in a racially neutral manner. If mandatory testing must be done, then it must be done for everyone; not based on racial classifications and stereotypes.

## PARTIES, JURISDICTION AND VENUE

3.     Plaintiff, Susana Castillo, has been a seasonal Latino agricultural worker at Riveridge Produce in Sparta, Michigan for 14 years. She resides and works in Western Michigan. She is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

4.     Plaintiff, Clarissa Vasquez, has been a seasonal Latino agricultural worker at Riveridge Produce in Sparta, Michigan for 8 years. She resides and works in Western Michigan. She is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

5.      Plaintiff, Veronica Botello, has been a seasonal Latino agricultural worker at Riveridge Produce in Sparta, Michigan for 2 years.  She resides and works in Western Michigan. She is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

6.      Plaintiff, Dulce Sostenes, has been a seasonal Latino agricultural worker at Riveridge Produce in Sparta, Michigan for 1 year.  She resides and works in Western Michigan. She is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

7.      Plaintiff, Dorealia Nunez, has been a seasonal Latinos agricultural worker at True Blue Processing for 23 years.  She resides and works in Western Michigan.  She is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

8.      Plaintiff Manual Nunez Morales, Jr., has been a seasonal Latino agricultural worker at True Blue Processing for 12 years.  He resides and works in Western Michigan.  He is directly subject to the Order at issue in this lawsuit, and will be mandated to take a COVID-19 test by August 24, 2020.

9.      True Blue Berry Management, LLC, is the administrative arm of the True Blue farming entities, which own and harvest fruit.  True Blue Berry is located at 09548 CR 215 Grand Junction, Michigan 49056.  Over 90% of True Blue's workforce is Latino, including 95% of its migrant and seasonal workers.

10.      Plaintiff, Smeltzer Orchards Co., LLC, is both a producer and processor of fruit products, including cherries, blueberries, strawberries, and apples, and is located at 6032 Joyfield

3

Road Frankfort, Michigan 49635.  As a producer and processer of fruit, Smeltzer Orchards employs numerous Latino agricultural workers.

11.     Defendant, Gretchen Whitmer, is and at all times relevant to this Complaint was the Governor of the State of Michigan and responsible for enforcing the laws of the State of Michigan, and charged with implementing policy through executive orders, and through orders issued by other departments of the State's executive branch.

12.     Defendant Whitmer is sued in her official capacity only.

13.     Defendant Robert Gordon ("Director Gordon") is, and at all times relevant to this Complaint was, the Director of the Michigan Department of Health and Human Services ("MDHHS"), acting under color of state law.

14.     Defendant Gordon is sued in his official capacity only.

15.     Pursuant to his authority as Director of the MDHHS, Director Gordon is empowered to enforce the laws of the State of Michigan with regard to the public health.

16.     As described below, Director Gordon issued an Emergency Order and FAQs, mandating COVID-19 testing for migrant and seasonal workers in the agricultural and food processing industries.

17.     Defendant Gary McDowell ("Director McDowell") is, and at all times relevant to this Complaint was, the Director of the Michigan Department of Agriculture and Rural Development ("MDARD"), acting under color of state law.

18.     Pursuant to the mandates of the Order, Director McDowell and MDARD are tasked, jointly with MDHHS, to enforce and impose penalties for violations of the State's Order.

19.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging violation of

rights and privileges under the United States Constitution.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

20.     This action is brought by Plaintiffs to obtain relief under, 42 U.S.C. §§ 1983, and the Fourteenth Amendment, U.S. Const. Amend. XIV, Rules 57 and 65 of the Federal Rules of Procedure, *Ex Parte Young*, 209 U.S. 123 (1908), and the general legal and equitable powers of this Court.

21.     Plaintiffs' claim for an award of their reasonable costs of litigation, including attorneys' fees and expenses, is authorized by 42 U.S.C. § 1988 and other applicable law.

22.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and Defendants are residents of the State in which this district is located.

<u>**GENERAL ALLEGATIONS**</u>

A.     <u>**The State Issues an Emergency Order.**</u>

23.     After the World Health Organization ("WHO") and the Center for Disease Control and Prevention ("CDC") identified the novel coronavirus ("COVID-19") as a "public health emergency of international concern", Governor Whitmer proclaimed the existence of a state of emergency throughout the State of Michigan on March 10, 2020.

24.     Since March 10, 2020, Governor Whitmer has issued no fewer than 163 separate executive orders in response to COVID-19.

25.     Executive Order 2020-137 (the "EO"), attached as **Exhibit A**, took effect on June 29, 2020.  The EO, among other things, stated that the State "must take proactive, preventive measures to create safer living conditions for migrant workers" during the COVID-19 pandemic. *See id.*

5

26.     According to the EO, "COVID-19 can spread easily in setting when many people live in close proximity, such as the migrant housing camps that house thousands of migrant agricultural workers in Michigan each year." *See id.*

27.     As a result, the EO directs "[t]hose who provide housing for Michigan's migrant agricultural workers must implement plans to prevent exposure to the novel coronavirus that causes COVID-19, care for individuals with COVID-19, and prevent the spread of disease among their workers based on this directive." *See id.*

28.     Subsequent to Governor Whitmer's EO, on August 3, 2020, Director Gordon issued an Emergency Order, mandating COVID-19 testing for "Migrant Agricultural Workers," defined as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence, including H-2A workers." *See* attached **Exhibit B**.

29.     The Order requires "that owners and operators of migrant housing camps take preventative measures to decrease spread of COVID-19 among workers." *See id.*

30.     The measures put into place by the Order are patently discriminatory.

31.     The Order mandates that all newly arriving residents to MDARD licensed migrant housing camps must take a COVID-19 test within 48 hours after arrival, regardless of if they have COVID-19 symptoms, or have been exposed to someone that has tested positive for COVID-19. *See id.* at ¶ 3(a)(ii).  Newly arriving residents are then subjected to a second COVID-19 test 10-14 days after arrival. *See id.* at ¶ 3(a)(v).

32.     Similarly, agricultural employers with over 20 workers on site at a time must provide testing for all new workers prior to beginning in-person work. *See id.* at ¶ 3(a)(ii).  The Order defines "agricultural employer" as: all employers of migrant agriculture workers who do

not live on site, including H-2A workers; all employers of seasonal agricultural workers who do not live on site; all owners and operators of meat, poultry, and egg processing plants; and all owners and operators of greenhouses. *See id.* at ¶¶ 3(b)(iii) (1-4).

33.     The Order also requires "one-time baseline testing of all current workers or residents." *See id* at ¶ 3(c).  In other words, regardless of whether a Latino agricultural worker has any COVID-19 symptoms, or if a worker has been exposed to someone who has tested positive for COVID-19, that worker is mandated to take a COVID-19 test.

34.     If mandatory testing wasn't enough, the Order also attaches harsh consequences to workers that refuse to take a mandatory test.  If a worker declines testing, that worker "may not conduct in-person work." *See id* at ¶ 3(j).   If a worker declines testing and lives in a licensed migrant housing camp, that worker "must be housed in isolation."  *See id.*

35.     Under the Order, the worker cannot work, and potentially cannot leave isolation, until the worker is tested and receives a documented negative result.  *See id.*

36.     The Order even goes as far as mandating that the State can make "housing suitable for isolation or quarantine for agricultural workers with COVID-19." *See id* at ¶ 5.

37.     In conjunction with the Order, the MDHHS also put forth FAQs, related to the mandatory COVID-19 testing of Latino agricultural workers.  *See* attached as **Exhibit C**.

38.     The FAQs further confirmed that "[a]ll workers employed and all residents present at housing camps on August 24, 2020 must have completed one-time baseline testing." *See id.* at 2.

39.     The DHHS's FAQs explain that all workers must receive a COVID-19 test, even if that worker has no COVID-19 symptoms and the worker has never been exposed to a person that has tested positive for COVID-19.

40.     Like the Order, the FAQs state that "[w]orkers who decline testing may not conduct in-person work and, if living in a licensed migrant housing camp, must stay in isolation housing." *See id.* at 7.

**B.      The State's Order Targets Latino Workers.**

41.     On August 3, 2020, the same day the Order was issued, the State admitted in the News Release exactly what the Order was all about—Latinos.  *See* attached **Exhibit D**.

42.     The News Release quoted Director Gordon: "'[t]oday's order will help to reduce the spread of COVID in communities across Michigan and reduce the pandemic's impact on Latinos.'"  *See id.*  Further, "'[t]he men and women who work in our fields and processing plants are at particular risk for COVID-19 and they need and deserve protection.'"  *See id.*

43.     To further justify its unapologetic targeting of Latinos, the State News Release explained "Latinos are 5 percent of Michigan's population but represent 11 percent of COVID cases in which the individual's ethnicity is identified."  *See id.*

44.     In a recent interview with Bloomberg law, Director Gordon doubled-down on the racial motivation behind the Order, stating: "[w]e are talking about a virus that has had a horrible disparate impact by race."  *See* attached **Exhibit E**.   He further explained that the disparate impact on Latinos is "enormous", pointing to "the spread of Covid in farm and food processing plants."  *See id.*

45.     Director Gordon went on to fuel a stereotype that Latinos are "disadvantaged" and incapable of taking care of themselves:  "[w]e are talking about a group of workers who are quite vulnerable, who are not well positioned to speak up for themselves."  *See id.*

**C.**   **The Order Ignores Both the Areas of the "Food and Beverage" Industry that are Less Likely to Have Latino Workers and Similarly Situated Housing Scenarios.**

46.     There is no reasonable justification for mandating Latino agricultural workers in the agricultural and food processing industries to take COVID-19 testing, absent having COVID-19 symptoms or exposure to an individual with COVID-19.

47.     The food and beverage industry is huge.   It encompasses numerous areas of employment:




Agriculture and its related industries provide 11 percent of U.S. employment

In 2018, 22.0 million full- and part-time jobs were related to the agricultural and food sectors — 11.0 percent of total U.S. employment. Direct on-farm employment accounted for about 2.6 million of these jobs, or 1.3 percent of U.S. employment. Employment in agriculture-and food-related industries supported another 19.4 million jobs. Of this, food service, eating and drinking places accounted for the largest share — 12.8 million jobs — and food/beverage stores supported 3.2 million jobs. The remaining agriculture-related industries together added another 3.4 million jobs.

48.     The State has not explained why the Order is targeted at Latino work populations, in the food and beverage industry, but not other segments of the same industry.

49.     Only the meat, poultry, and egg sectors of the much larger "food processing" industry were targeted for enforcement.   Bakeries, flour mills, general food processors and the like were not subjected to mandatory testing; only the segments known to the State to be supported by Latino workers.

50.     The State's Order partially justifies its mandates by citing migrant housing, and reference to "congregate living settings" and "migrant housing camps", which in the State's view

are at higher risk for transmission of the COVID-19 virus.  Specifically, the Order points to those living situations as having "substantial outbreaks."

51.     However, the State's Order entirely ignores other communal housing situations as if migrant housing is any different than other common group living settings.

52.      The Order does not target college students living in dorms, or sorority/fraternity housing on college campuses.  The possibility for transferring COVID-19 is obvious in this scenario, considering the infamous spread of COVID-19 at Harper's Bar at Michigan State University.

53.     The Order also ignores summer camps, where campers remain in close proximity, and which have also suffered from "substantial outbreaks" of COVID-19.

54.     On May 5, 2020, 53 COVID-19 cases were confirmed to be the result of the Spring Ministries Summer Camp in Gladwin, Michigan.

55.     Similarly, on July 24, 2020, health officials warned that 250 people who attended a Southwest Michigan overnight camp were at risk of coronavirus exposure after several people at the camp tested positive for the virus.

56.     Yet, instead of being mandated to take a COVID-19 test before arriving at residential camps, State guidance merely encourages camps to test.

57.      The only distinction between the above scenarios and migrant housing camps, is that migrant housing camps are used by Latino workers.

58.     The State has adopted increased enforcement for COVID-19 based upon a racial classification, instead of racially neutral criteria.  If that were not the case, the Order would have required other individuals in close-proximity housing situations to take mandatory COVID-19 testing.

**D.**   **The Order Completely Disregards Outbreaks in Other Industries.**

59.   Though citing "substantial outbreaks" and the "significant risk of COVID-19 spread among the broader community", the Order completely ignores COVID-19 outbreaks that have occurred in other industries.

60.   Other industries have more COVID-19 outbreaks than the agriculture and food processing industry:



61.   According to the data, 50% of the 194 ongoing COVID-19 outbreaks are tied to nursing homes and long-term adult care centers.

62.   The State's "outbreak" rationale for its Order is a complete pretense.

63.   Plaintiff-employers have not experienced a COVID-19 outbreak for more than 6 months, despite their high percentage Latino workforce.  This is true, even though  90% of plaintiff True Blue's entire workforce is Latino, and 95% of plaintiff's migrant and seasonal workers identify as Latino.

64.     The data demonstrates that there are very few new outbreaks in the agricultural and food processing industry.  In fact, Plaintiffs' industry is well below other sectors not subject to the State's mandatory testing.

65.     Workers in Michigan's automotive parts plants have contributed to the COVID-19 pandemic's spread, with a recent outbreak in one manufacturer's Battle Creek, Michigan plant, resulting in one worker dying, and 13 being infected.

66.     As recent as August 6, 2020, an Oakland County-based mortgage company had more than 50 workers that contracted COVID-19.  Those workers are in a closed, office-setting, increasing the chance of COVID-19 spread, compared to Latino agriculture workers—the vast majority of whom work outdoors.

67.     The grocery store industry has also not been immune to COVID-19 outbreaks.  In May, according to one article, as many as 10,000 grocery store workers had been infected by, or exposed to, COVID-19.  That same article cites as many as 68 deaths resulting from the virus.

68.     Despite the apparent COVID-19 outbreaks in the industries listed above, the Order chooses to focus on Latino agricultural workers.

**E.      The Order's Mandatory Testing Does More Harm Than Good.**

69.     The Order has the potential to completely uproot the lives of many Latino agricultural workers and destroy the agricultural and food processing industry.

70.     Plaintiffs also feel the fundamental unfairness of the State's mandate.  Due to the discriminatory nature of the Order's mandate, it makes them feel like their own Government cares more about non-Latino citizens.

71.     The Order directly threatens Plaintiffs, their livelihoods, their housing arrangements, and leaves them in unnecessary fear.

12

72.     Plaintiffs will seriously consider leaving their employment, if they are mandated to test for COVID-19.  In addition, despite the State's belief that Latino workers are "vulnerable" and "not well positioned to speak up for themselves", Plaintiffs are perfectly cable of protecting themselves from COVID-19.

73.     Plaintiffs have been employing COVID-19 prevention practices, both at work and outside of work, well before the Order was put into place.  Those practices include wearing a mask, social distancing, and utilizing disinfectants.

74.     Plaintiffs fear the substantial impact the Order's mandates will have on their income.  Plaintiff Clarissa Vasquez, who has been working as a seasonal agricultural worker for 8 years at Riveridge Produce, is the sole provider for her family.  She fears that the results of a mandated test may prevent her from working, which will result in a substantial loss of her income, at a time of the year when she earns most of her family's income.

75.     Similarly, Plaintiff Susana Castillo uses the extra-income from the peak season for her family's future and son's college education.  She also fears that the Order's mandate will cause her to lose much of her income.

76.     Equally concerning, Plaintiffs fear that their employer provided housing will be jeopardized by a mandated test.  As a result, and due to restrictions on employer provided housing, Plaintiffs fear that a test result could require them to be separated from their family and friends.

77.     Plaintiffs also worry about undergoing a medical test that is not necessary.  Plaintiff Clarissa Vasquez is worried about the risk of infection through the testing process, especially because she has three children at home with a heart murmur and asthma.

78.     Plaintiff Dulce Sostenes worries that subjecting herself to unnecessary testing, which may  cause her to potentially bring the virus home to her 15 year old sister that has been in quarantine since March.

79.     The Order's mandates certainly don't only impact Latino workers.  Employers of Latino workers also bear the heavy burden of the State's testing mandates.  *See* Employer Declarations at **Exhibit F**.   This is true, despite Plaintiff-employers' diligently taking COVID-19 precautions.

80.     For instance, because workers are required to take a mandatory COVID-19 test in order to remain employed, there is a significant risk that those workers will choose to pursue opportunities in industries without mandatory testing to avoid the risk of being unable to work.  Or in the alternative, if required to test employees will resign.  Yet, any loss of employees would significantly impact Plaintiffs.

81.     Plaintiff True Blue relies heavily on Latino workers to meet its employment needs.  If its harvest is delayed or stopped for any reason, its crop will be lost, which would be catastrophic for its business.  Additionally, True Blue now enters the late season with higher revenue crop, which compensates for lower prices earlier in the season.  Without revenue from August/September crop, True Blue will not meet its expenses.

82.     Based on worker comments, True Blue believes up to 75% of its workers will resign if mandated to test.

83.     Plaintiff Smeltzer Orchard's demand for migrant and seasonal workers peaks significantly during prime growing and harvesting seasons.  In particular, Smeltzer Orchards needs 136 processing line workers to meet harvest and customer demands.  The loss of a substantial number of employees would also threaten its business.

84.     Plaintiffs also worry about the Order's mandates discouraging Latino workers from applying to work at their businesses.

85.     Notwithstanding the heavy burdens above, there are also significant flaws in the COVID-19 testing processes, creating nightmarish consequences for employers and employees of the agricultural and food processing industry.

86.     Most notable is the well documented false positive test results associated with COVID-19 testing, a concern among many Latino workers and their employers.

87.     The Food and Drug Administration has warned that one manufacturer of COVID-19 tests, Becton Dickinson, had a false positive rate of 3%.  The State has sought more tests from that same manufacturer.

88.     Matthew Stafford, the Detroit Lions quarterback, received a false positive test result after receiving two negative test results days prior to his positive result, which then followed three more negative results.

89.     Similarly, Ohio's Governor Mike DeWine received a positive test result after taking a COVID-19 test, but hours later tested negative after taking a different COVID-19 test.

90.     These high-profile public figures suffer little consequence from false positives as they have ample access to as many repeat tests as they like.  Not so for the Plaintiff-workers.

91.     The Order contains no provision for re-testing.  Therefore, false positive tests can dramatically impact Plaintiffs.

92.     For instance, one positive test is determinative, and one "positive" test means loss of employment and housing.

93.      It doesn't stop there.  Other workers who have been exposed (within six feet for 15 minutes) to that false positive worker will also be unable to work.  Then, that false positive

worker, and all workers "exposed", must be put into isolation or quarantine, including isolation housing.

94.     Thus, one false positive test result can completely turn the lives of Plaintiffs upside down, as well as nearly wipe out an entire workforce in the agricultural and food processing industry, all for a worker who does not have COVID-19.

95.     What's worse, Plaintiffs have limited options for obtaining COVID-19 testing for their employees.  For instance, Plaintiff Smeltzer Orchards is located in Benzie County, which has limited testing options.  The one testing site in Benzie County will not test without a doctor's note confirming symptoms. Similarly, Occupational Health in Traverse City will not test without phone screen to confirm symptoms. The Rite Aid in Traverse City, an hour drive away, has wait times that have been substantial.   Further, test results by mail take at least 14 days.

96.     For the above-mentioned reasons, among others, the State's Order clearly discriminates against Plaintiffs, by treating them differently than similarly situated individuals because of their race.   Any doubt of the same is erased when looking at the State's own proclamations: "[w]e are talking about a virus that has had a horrible disparate impact by race" "Latinos are 5 percent of Michigan's population but represent 11 percent of COVID cases in which the individual's ethnicity is identified."

97.     The State's purposeful discrimination is a direct violation of Plaintiffs' constitutional rights, including equal protection of the law.

## COUNT I
## EQUAL PROTECTION – FOURTEENTH AMENDMENT

98.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

99.   The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. 14, § 1.

100.   Individual Plaintiffs are Latino and members of a protected class.

101.   Plaintiff employers are being required to take additional action because they employ Latino workers.

102.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of State law, Governor Whitmer, Director Gordon, and Director McDowell have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

103.   As set forth in this Complaint, the Order deprives Plaintiffs, as Latinos, by discriminating against them based on race, and mandating they take/administer COVID-19 tests, while not requiring other similarly situated individuals and businesses to do so.

104.   The Defendants had a discriminatory purpose in mandating that Latino agricultural works take COVID-19 tests, while not requiring other similarly situated individuals and businesses to do so.

105.   The Order and Defendants' practices are subject to strict scrutiny because they are based on racial status.

106.   The challenged measures further no compelling state interest, nor is the different treatment narrowly tailored, substantially related to, or the least restrictive alternative for achieving the state interest.  Nor is there even a rational connection between any legitimate governmental interest and Defendants' disparate treatment of Latinos.

107.     When the government treats an individual disparately as compared to similarly situated persons and businesses and that disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis, such treatment violates the equal protection guarantee of the Fourteenth Amendment.  As set forth in this Complaint, the challenged measures of the Order and its FAQs violate the equal protection guarantees of the Fourteenth Amendment.

108.     As a direct and proximate result of Defendants' violation of the equal protection guarantee of the Fourteenth Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## COUNT II
## DECLARATORY JUDGMENT
### (Unlawful Exercise of Authority Under State Law)

109.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

110.     The Emergency Order is unenforceable because Director Gordon lacked authority to issue it.

111.     In the Order, Director Gordon cites MCL 333.2253 as authority allowing him to establish procedures to be followed during an epidemic to ensure continuation of the public health services and enforcement of health laws.

112.     MCL 333.2253(1) states "[i]f the director determines that control of an epidemic is necessary to protect the public health, the director by emergency order may prohibit the gathering of people for any purpose and may establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws.  Emergency procedures shall not be limited to this code."

113.    However, Director Gordon's Order does not prohibit gatherings, nor is it a procedure for continuation of public health services.

114.    Rather, the Order mandates that certain employers require their employees to test for COVID-19, and if they refuse, those employees cannot work.  Furthermore, employers are required to pay for such mandated testing.

115.    Yet, MCL 333.2253 does not grant the Director the broad authority to enact such restrictive, and as argued above, discriminatory measures.   Certainly, the statute does not provide the Director authority to mandate medical tests.

116.    Plaintiffs have no adequate remedy at law for this continuing unlawful action by the Defendants.

### COUNT III
### VIOLATION OF THE EMERGECY MANAGEMENT ACT

117.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

118.    The Governor's COVID-19 executive orders have relied, in large part, on the Emergency Management Act , MCL 30.401-30.421, which is also relied upon by the Director Gordon.

119.    Under the EMA, the Governor may unilaterally declare an emergency or disaster and the exercise her legislatively delegated authority—but only for 28 days.  After 28 days, the Governor's EMA powers end unless the Legislature approves a continuing state of emergency or disaster.  MCL 30.403(3)-(4).

120.    Given the COVID-19 pandemic, the Governor declared a state of emergency under MCL 30.403(4) on March 10, 2020; and she expanded that initial declaration to include a

state of disaster under MCL 30.403(3) on April 1, 2020, before subsequently requesting a legislative extension of the declaration.

121.    On April l7, 2020 the Legislature agreed, via concurrent resolution to extend the declarations of emergency and disaster to April 30, 2020.

122.    The Legislature did not approve a further extension of any emergency or disaster declaration.

123.    The Governor terminated her declarations of a COVID-19 emergency and disaster under the EMA, as is statutorily required, but restated the same declarations under that same law just one minute later.

124.    The Governor next issued another stay-at-home order relying on her emergency powers under the EMA.

125.    The Governor further ordered that all other still-existing COVID-19 executive orders now rest, in part, on her redeclared EMA emergency and disaster declarations.

126.    Those actions are inconsistent with the EMA's plain text.

127.    The Governor's contrary interpretation of the EMA would nullify the EMA's carefully circumscribed cooperative regime; produce absurd results; render the Legislature's role a nullity; and defeat a central purpose of the statute: allocating power across both the legislative and executive branches to respond to crises.

128.    The Court should declare that the State cannot rely on the EMA to justify the Order.

### COUNT IV
### VIOLATION OF THE EMERGENCY POWERS OF THE GOVERNOR ACT

129.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

130.    The Governor's COVID-19 executive orders have also relied, in part, on authority from the delegation in the Emergency Powers of Governor Act, MCL 10.31-10.33.

131.    The EPGA, however, does not provide authority for the Governor's statewide COVID-19 executive orders, or the Order at issue in this case.

132.    The EPGA's plain text, especially when considered with the EMA's language and the EPGA's historical context, show that the EPGA was intended to address local crises in the vein of civil disturbances in an area within the state—not statewide health emergencies.

133.    Interpreting the EPGA otherwise would disregard the plain language of the EPGA and create significant constitutional concerns.

134.    If, however, the EMA and EPGA are construed to be coextensive, then under the doctrine of *in pari materia,* the EMA's 28-day rule applies to the EPGA.

135.    The Court should declare that the EPGA does not provide authority for the Order.

**COUNT V**
**VIOLATION OF ARTICLE 5, § 1, OF THE 1963 MICHIGAN CONSTITUTION**

136.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

137.    The Governor's COVID-19 executive orders, and the Order, have relied, in part, on the government's authority under Article 5, § 1, of Michigan's 1963 Constitution. This includes, for example, EO 2020-70, Michigan's "stay-at-home order," which purports to "suspend activities that are not necessary to sustain or protect life." EO 2020-70.

138.    Article 5, § 1 says: "Except to the extent limited or abrogated by article V, section 2, or article IV, section 6, the executive power is vested in the governor." (Neither of those exceptions applies here.)

139. The Governor's COVID-19 executive orders, including Director Gordon's Order, are an exercise of *lawmaking,* not executive authority.

140. Under Article 5, § 1, "[t]he Governor has no power to make laws." *Taxpayers of Mich Against Casinos v State,* 471 Mich 306, 356; 685 NW2d 221 (2004) (Weaver, J., concurring), citing *People v Dettenthaler,* 118 Mich 595; 77 NW 450 (1898).

141. Rather, "[e]xcept to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. Importantly, neither of those exceptions apply here: Article 4, § 6, gives legislative power to the redistricting commission, and Article 5, § 2, "delegate[s] a very limited and specific legislative power to the executive." *Soap & Detergent Ass'n v Nat. Res Com'n,* 415 Mich 728, 753; 330 NW2d 346 (1982).

142. Therefore, the Court should declare that Article 5, § 1, does not give the Governor or Director Gordon the power to issue lawmaking executive orders, including the Order, to address an emergency including the power to suspend, vitiate, modify, or supplement existing Michigan laws.

## COUNT VI
## VIOLATION OF ARTICLE 3, § 2, OF THE 1963 MICHIGAN CONSTITUTION

143. Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs.

144. As noted above, the Executive Branch has no lawmaking authority; rather, the Legislature is *the* lawmaking branch of Michigan's government. Const 1963, art 4, § 1.

145. Michigan's separation of powers clause says: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of

one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2.

146.    Director Gordon's Order, which constitutes executive branch "lawmaking", violates the Michigan Constitution.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court, on an expedited basis, enter judgment in their favor and against Governor Gretchen Whitmer, Director Robert Gordon, and Director Gary McDowell, as follows:

A.    Declaring Director Gordon's Order is in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

B.    Declaring that Governor Whitmer, Director Gordon, and Director McDowell violated Plaintiffs' fundamental constitutional rights as set forth in this Complaint;

C.    Temporarily, preliminarily, and permanently enjoining and restraining Governor Whitmer, Director Gordon, and Director McDowell and any other person acting under authority of the Governor and Directors, from enforcing the Order and/or the FAQs as set forth in this Complaint, including but not limited to the Order's mandate for all covered workers to take a COVID-19 test;

D.    Declaring Director Gordon exceeded the scope of his statutory authority under MCL 333.2253 in issuing the Order, and mandating individuals take medical tests.

E.    Declaring the Governor's authority to act under the EMA ended April 30, 2020; The EPGA does not provide authority for the Governor's COVID-19 executive orders or the Order; The Governor and Director Gordon have no lawmaking

power under Const 1963, art 5, § 1; and the Order violates the separation of powers.

E.      Awarding Plaintiffs compensatory damages;

F.      Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

G.      Awarding all other relief to which Plaintiffs may be entitled.


Date:  August 11, 2020      By:   */s/ Aaron M. Phelps*
                                       Ronald G. DeWaard (P44117)
                                       Aaron M. Phelps (P64790)
                                       Brion B. Doyle (P67870)
                                       Seth B. Arthur (P82033)
                                       333 Bridge St NW Ste 1700
                                       Grand Rapids, MI 49504
                                       (616) 336-6000